AO 91 (Rev. 11/11) Criminal Complaint

United States Courts
Southern District of Texas
FILED
April 25, 2023
Nathan Ochsner, Clerk of Court

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

United States of America
v.
ANTOINE BROOKS, TYREE HEBERT and KAMARA HALL

Case No. **4:23-mj-833(1-3)**

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **April 21, 2023** in the county of **Harris** in the **Southern** District of **Texas**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 875(d) | Extortion |
| Title 18 U.S.C. § 2261A(2) | Stalking |

This criminal complaint is based on these facts:
See attached probable cause statement.

☒ Continued on the attached sheet.

*Complainant's signature*

Special Agent Joseph Gregory, FBI
*Printed name and title*

Sworn to before me telephonically.

Date: 04/25/2023

*Judge's signature*

City and state: Houston, Texas

Peter Bray, United States Magistrate Judge
*Printed name and title*

4:23-mj-833(1-3)

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Joseph Gregory, being duly sworn, depose and state:

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since July 2018. I hold a Juris Doctor degree from New York Law School, and prior to joining the FBI, I was an attorney for over five years. In my capacity as an FBI Special Agent, I have participated in investigations of various federal criminal violations including violent crimes, money laundering, and other complex financial crimes. I am currently assigned to the Violent Crimes Squad in the Houston Division and was previously assigned to the Money Laundering and Financial Institution Related Fraud Squad. Over the years, I have conducted or participated in physical surveillances, Title III electronic surveillances, the execution of search warrants, debriefings of informants, and attended specialized and advanced trainings related to both violent and complex financial crimes. Through my training, education, and experience, including conversations with other law enforcement officers, I have become familiar with the patterns of activity regarding extortion and stalking suspects and the methods they employ to plan, coordinate, and conduct these activities.

2.  This Affidavit is made in support of a criminal complaint charging Antoine Brooks, Tyree Hebert, and Kamara Hall with Extortion in violation of Title 18 U.S.C. § 875(d) and Stalking in violation of Title 18 U.S.C. § 2261A(2). I am familiar with the information contained in this Affidavit based upon the investigation I have personally conducted and my conversations with other law enforcement officers involved in this investigation.

3.  Because this Affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause that violations of Title 18 U.S.C. § 875(d) and Title 18 U.S.C. § 2261A(2) have been committed by Antoine Brooks, Tyree Hebert, and Kamara Hall. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

### PROBABLE CAUSE

1

4. The FBI is investigating an alleged extortion and stalking scheme being committed against L.S., an 82-year-old male residing in the Houston area of the Southern District of Texas, by Antoine Brooks, a 37-year-old male (BROOKS), Tyree Hebert, an 18-year-old male (HEBERT), and Kamara Hall, a 21-year-old female (HALL). Based on evidence reviewed to date and detailed within this affidavit, BROOKS, HEBERT, and HALL have conspired together to commit the extortion and stalking scheme utilizing electronic communication devices transmitting communications in interstate commerce, in addition to in-person acts in furtherance of the scheme taken by each of them.

5. In April 2023, FBI Houston received information from complainant V.W., an attorney and former FBI agent, indicating that her client, L.S., was being extorted and threatened by BROOKS, HEBERT, and HALL. According to V.W., HEBERT is a prostitute, and BROOKS is believed to be his pimp. L.S. engaged V.W. on or about April 4, 2023 because he did not know how to stop the harassment by BROOKS, HEBERT, and HALL, and he needed assistance gathering information to be presented to law enforcement.

6. On April 20, 2023, your Affiant met with and interviewed L.S. Affiant observed L.S. to be a physically frail elderly man. L.S. was upset, in emotional distress, and feared for his safety because of the events detailed below. Affiant also met L.S.'s wife, who appeared elderly and physically frail. According, to L.S., he found an advertisement online for HEBERT offering sexual services. L.S. met up with HEBERT, and the two had a consensual sexual encounter in exchange for L.S. paying HEBERT a sum of money. According to L.S., he and HEBERT did not have sexual intercourse; the sexual acts consisted of massages with "happy endings," and the agreed-upon fee was paid. According to V.W., the initial sexual encounter between L.S. and HEBERT may have been around late spring or early summer 2022.

7. HEBERT began demanding more money from L.S. following their sexual encounters. According to L.S., HEBERT called him to say that if he did not pay up, HEBERT knows where he lives. L.S. told HEBERT there was no more money, and HEBERT told L.S. he is coming to L.S.'s house, reiterating he knows where L.S. lives. L.S. told investigators he went to the police following this phone call because he felt threatened. According to L.S., HEBERT also told him over the phone that HEBERT was going to kill L.S.'s chickens on his

2

property, and that he was going to damage his property and possessions. V.W. provided investigators with a screenshot of the following text messages from HEBERT to L.S., where HEBERT is threatening to report L.S. to the police; according to L.S., he put HEBERT in his phone as "Anthony Williams", which was a code name HEBERT:



8. As Affiant noted above, L.S. is a frail 82-year-old man. L.S. appears to struggle physically even just walking around. Based on his physical condition, Affiant does not believe it would have been possible for L.S. to have raped HEBERT as claimed in the above text message.

9. At some point after the sexual encounters began, L.S. received a phone call from BROOKS. During that call, BROOKS told L.S. that HEBERT was only 17 years old at the time of their sexual encounters. According to L.S., BROOKS made a comment to him about people in jail liking old men who are there for being with minors. BROOKS told L.S. to drive to the location where BROOKS supposedly was. L.S. began driving to meet BROOKS, but he got cold feet and turned around. L.S. also stated BROOKS sent him a photograph of an old man kissing a young man on his phone. Based on his conversation with BROOKS, L.S. believed BROOKS was going to report him to police if L.S. did not meet with him.

10. According to L.S., he told HEBERT to get out of his life., but HEBERT wanted $15,000 initially, and then requested an additional $15,000. L.S.'s communications with HEBERT were via phone calls, text messages, and in-person. HEBERT went to L.S.'s property three to four times according to L.S. HEBERT would show up at L.S.'s house, acting in an aggressive manner and requesting more money. L.S. felt threatened by HEBERT, so he would go to the bank and get $5,000 or so on several occasions to pay HEBERT. On one occasion, HEBERT and HALL both went on L.S.'s property and danced around his pool demanding money. HEBERT last went to L.S.'s home approximately three weeks ago according to L.S. According to V.W., L.S. had to have an alarm system installed due to HEBERT and HALL showing up uninvited to L.S.'s home, including one time when they entered L.S.'s property while L.S. and his wife were out of town.

11. According to V.W., when BROOKS called L.S. after he engaged V.W. as his attorney, he gave BROOKS her contact information and told BROOKS to call her. On April 12, 2023, BROOKS called V.W. on the phone. V.W. recorded the call and provided a copy of the recording to investigators. The following are excerpts and summarizations from the call:
    a. BROOKS introduced himself and said he is HEBERT's father. BROOKS stated that L.S. had been having sexual relations with HEBERT for a year and a half,

and that HEBERT only turned 17 last year (Affiant notes that HEBERT turned 18 in July 2022).

b. BROOKS stated L.S. gave them a proposal and then provided HEBERT with a $20,000 check and $10,000 cash. BROOKS claimed HEBERT took the money and ran.

c. HALL can be heard in the background with BROOKS; HALL introduced herself, stated she is L.S.'s friend, and that L.S. was also going to give her a proposal because she has a 1-year old child and L.S. wanted to help them.

d. BROOKS referred to himself as the "ringleader" during the call and said L.S. is giving money to the wrong person.

e. HALL stated, "That's the only reason why we trying to get a proposal so we can leave him alone, and I can take care of my baby like he said he was going to do, and that's it."

f. V.W. asked HALL and BROOKS what kind of proposal they want, and they responded by saying they want $30,000, which they claim L.S. agreed to. BROOKS stated the way it was originally supposed to go, was that L.S. was supposed to give $30,000 to BROOKS, and BROOKS would give $10,000 to HEBERT, $10,000 to HALL, and keep $10,000 for himself.

g. HALL stated L.S. wanted HALL and BROOKS to help make HEBERT stop going to L.S.'s house, because HEBERT was going to L.S.'s house every day, jumping the gate and messing with L.S.

h. V.W. asked BROOKS and HALL, "How do we ensure what, what is the final that we need to pay so that you will leave [L.S.] alone?" HALL said "30", and BROOKS said they will sign the papers. HALL also stated, "We not the ones messing with him. He want us to make [HEBERT] stop messing with him. But we can't settle no business unless he settle the business with us." V.W. told BROOKS and HALL she would write a contract to settle everything.

i. BROOKS stated, "The 30,000 is for us to get [HEBERT] to calm down, stop, for people to stop harassing [L.S.], [L.S.] is 82-years old. About to give [L.S.] a goddamn heart attack man… [Unintelligible]… I ain't never been to [L.S.'s] house one time, and I'm the, I am the ringleader of this shit. I'm the one that

5

goddamn [unintelligible] them up and told them what to do to get this money. So [unintelligible] been back over there around there because I don't even like how this shit going because it didn't supposed to go like that man..."

j. V.W. stated, "And if we give you this money, y'all will leave him alone." BROOKS responded with "yes ma'am." V.W. further stated, "and you won't go to the police." BROOKS responded with "yes ma'am. No police. I [Unintelligible] never going to the police no way, man that man 82." BROOKS further stated he is not threatening L.S., but he has to let L.S. know why he is in the situation he is in.

k. Toward the end of the call, BROOKS stated, "This proposal will make [HEBERT] leave [L.S.] alone, will make, I'm not fucking with him, make HALL leave him alone, and make me, uh make them, leave him alone. But the thing about it, is [L.S.] going to leave them alone!"

l. BROOKS also stated during the call that L.S. found HEBERT on an internet site.

12. At one point, HALL sent V.W. the following text messages, indicating there is a video of [L.S.] and HEBERT having sex:



13. Based on my training, experience, and knowledge of this investigation, while HALL states she would never expose "him" and "I don't black mail", the purpose behind even indicating that such a video exists is to indirectly threaten L.S. and to increase the pressure on him to pay.

14. On April 21, 2023, V.W. met with BROOKS, HALL, and HEBERT at a restaurant in Houston, Texas in order to sign the agreement discussed with BROOKS and HALL during the recorded phone call. This meeting was recorded and monitored by the FBI. Earlier that morning, prior to the meeting, BROOKS sent the following texts to V.W:



> Kuz Ty ran with 30 and his mama wasn't even apart of this... right now they in a bind so 10 for each kuz they have nothing to show for 30k and I'm not with Kamara but she really didn't get anything but 10k

> I most definitely should get the most I'm the mastermind behind this... but they went crazy on me I'm the wrote all the plays... they know what they did so they will agree trust me... we had this conversation me and my son not talking and me and Kamara until they get there business

15. Based on my training, experience, and knowledge of this investigation, the above statements from BROOKS about being "the mastermind" and the one that "wrote all the

plays" is further confirmation of the existence of an agreed-upon and coordinated extortion scheme between BROOKS, HALL, and HEBERT.

16. The following are surveillance photographs captured by the FBI during the meeting, which show BROOKS (red hat), HALL (in the middle with her hair up), and HEBERT (blue tank top sitting to the left of HALL) meeting with V.W.:





17.  During the meeting, BROOKS, HALL, and HEBERT each signed two agreements: one collectively, and one each individually. Each agreement was substantively the same, stating the following in the "Payment and Consideration" section:

> [L.S.] agrees to pay [the applicable party] the sum of Fifteen Thousand Dollars ($15,000.00) in exchange for [the applicable party] agreeing to the terms listed below.

The [applicable party] agrees to the following:

1. The [applicable party] will not have any further contact with [L.S.] or any of his family members;

2. The [applicable party] will stop all threats;

3. The [applicable party] will not threaten to inform law enforcement regarding any violation of law by [L.S.];

4. The [applicable party] will not inform law enforcement regarding any violation of law by [L.S.];

5. The [applicable party] will not threaten to injure the property or reputation of [L.S.];

6. The [applicable party] will not threaten to accuse [L.S.] of a crime;

7. The [applicable party] will not communicate with [L.S.] via in person communication, telephonic communication, text communication, email communication, or any other electronic communication;

8. The [applicable party] will not enter the property of [L.S.];

9. The [applicable party] will not destroy the property of [L.S.];

10. The [applicable party] will stop all harassment of [L.S.] and his family;

11. The [applicable party] will not release any videos or photographs of L.S.;

12. The [applicable party] will provide any videos and or photographs of [L.S.] to the authorized representative of [L.S.] signing below and destroy all copies; and

13. The [applicable party] will not make any additional demands for money, property, or any other type of compensation.

18. BROOKS, HALL, and HEBERT signed the agreements during the meeting and are expecting their payments sometime next week.

19. Based on my training and experience, I know that the use of cellular phones to make calls and send text messages as detailed within this affidavit constitutes the use of electronic

communications services and are means of transmitting communications in interstate commerce.

20. Based upon the information delineated above, I believe that probable cause exists for the issuance of a Criminal Complaint charging Antoine BROOKS, Tyree HEBERT, and Kamara HALL with Extortion in violation of Title 18 U.S.C. § 875(d) and Stalking in violation of Title 18 U.S.C. § 2261A(2).

Joseph Gregory
Special Agent, FBI

Subscribed and sworn to via telephone, this 25th day of April 2023 and I find probable cause.

Hon. Peter Bray
United States Magistrate Judge